George D. Zouganiles, Petitiover, v. Commissioner. George D. Zouganiles and Estate of Eva T. Zouganiles, Deceased, Walter Melrose, Administrator v. Commissioner.
Zouganiles v. Commissioner
Docket Nos. 59439, 59440.
United States Tax Court
T.C. Memo 1960-5; 1960 Tax Ct. Memo LEXIS 284; 19 T.C.M. (CCH) 13; T.C.M. (RIA) 60005; January 27, 1960
*284 Held, respondent's determination of deficiencies in accordance with net worth computation, sustained with adjustments. Held further, returns for the years 1947 and 1949 were not false or fraudulent with intent to evade tax, and no part of the deficiency for any of the years in issue was due to fraud with intent to evade tax. J. E. Simpson, Esq., Title Insurance Building, Los Angeles, Calif., for the petitioners. Earl C. Crouter, Esq., and Cyrus A. Johnson, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in the income tax and additions to tax of George D. Zouganiles and Eva T. Zouganiles as follows: Addition to Tax
Year
Deficiency
Section 293(b)
Docket No. 59439
George D. Zouganiles
1947
$ 1,502.50
$ 608.55
Docket No. 59440
George D. Zouganiles
1949
12,519.92
6,259.96
and Eva T. Zouganiles
1950
6,682.22
3,341.11
*285 The following issues are presented for decision: 1. Whether respondent properly resorted to and applied the net worth method in determining the net income of the petitioners for each of the years 1947, 1949, and 1950. 2. Whether any part of the deficiency for each of the years in issue was due to fraud with intent to evade tax. 3. Whether the assessment and collection of the deficiencies and additions to tax for each of the years 1947 and 1949 are barred by limitations. Findings of Fact During the years in issue George D. Zouganiles and Eva T. Zouganiles were husband and wife, residing in the State of California. Eva died on January 11, 1955, and Walter Melrose is the duly appointed administrator of her estate. Her estate is involved herein only because of certain income tax returns which Eva filed jointly with George. For the taxable year 1947, George timely filed an individual income tax return with the collector of internal revenue for the sixth district of California. George subsequently filed an amended individual income tax return for the year 1947. For each of the taxable years 1949 and 1950, George and Eva filed joint income tax returns with said collector. The *286 returns for the years 1947 and 1949 were filed on or before March 15, 1948, and March 15, 1950, respectively. The deficiency notices here involved were mailed on or after June 15, 1955. George was born in Greece and came to the United States as a small boy. During his youth he became a naturalized citizen of the United States. He has had no formal education in this country. During his adult life he has been a professional gambler. Prior to 1935 he worked in Florida and his wife worked as a night club entertainer. About 1936 they moved to Palm Springs, California, and commenced working in a gambling establishment located there. When he moved to California, George brought with him approximately $30,000. During the years 1937 to 1940, inclusive, George worked in a gambling establishment in Palm Springs at a salary of $200 to $250 per week, plus additional amounts which were sometimes paid him of approximately $50 to $100. During the years 1941 to 1950, inclusive, George engaged in his own business as a bookmaker, accepting bets on the results of horse races. During the year 1947, he conducted his bookmaking operation in the back room of a store in Cathedral City, California, which *287 is located about six miles from Palm Springs. After 1947, when the action of local law enforcement officers began to curtail gambling operations, George intermittently changed the site of his bookmaking business to the Athens Hotel in Palm Springs. Whether he conducted his business in Cathedral City or Palm Springs depended upon the extent to which local law enforcement officers curtailed his business operation. In addition to the bookmaking operation at Cathedral City, George offered gambling in the form of dice and card games. During the period in issue, George leased and operated the Athens Hotel in Palm Springs, California, which had approximately eight rental rooms. In December 1948, George became interested in a gambling establishment known as the North Shore Club which was located at Crystal Bay, Lake Tahoe, Nevada. He decided to buy a one-fifth interest in a partnership that was being formed to operate the North Shore Club. George borrowed $10,000 from the Bank of America on December 10, 1948. On May 19, 1949, he deposited $10,000 in the bank account of the North Shore Club. Albert Ligier, who managed George's horse book operation, kept books of account relating to the *288 operation of his bookmaking business. All daily records of gambling transactions were destroyed to minimize evidence of gambling and avoid detection by law enforcement officers. Ligier prepared the records of the Athens Hotel from information submitted to him by George. He did not keep any records of card or dice games conducted by George, but in 1947 George told him that he had won $2,120 at cards, which Ligier entered on the records kept for that year. Ligier kept no record of the North Shore Club operation. Ligier made monthly summaries of the daily records kept by him and delivered them to a "tax consultant" for use in the preparation of George's income tax returns. In carrying on the bookmaking business it was necessary that a sizeable amount of cash or "bankroll" be kept on hand to cover all wagering payments. George's bookmaking business had its highest activity during the racing season at the Santa Anita track, which opened during the week between Christmas and New Year's during the period in issue. During this period it was necessary to carry a larger bankroll to cover the increased wagering activity. On January 1, 1947, and December 31 of each of the years 1947 to 1950, *289 inclusive, George's bankroll amounted to $15,000. In 1947, George purchased stock in Palm Spring Heights, Inc., at a cost of $7,500. In 1948, he obtained a loan from Walter Melrose in the amount of $7,500 and endorsed and delivered such stock to Melrose as security for such loan. George did not repay the loan during the period in issue. In 1950, George invested $2,500 in a concern known as Pan American Chemicals Company. During the summers of 1949 and 1950, when the North Shore Club was operating at Lake Tahoe, George worked at the club. He rented a cottage near Lake Tahoe for use as his lodging while working at the club. The rental costs of such cottage which were incurred by George amounted to $1,050 and $1,000 for the years 1949 and 1950, respectively. George expended $396.50 and $351.99 during the years 1949 and 1950 for liquor, candy and food, some of which was given to local law enforcement officers. Of such amounts expended, he gave as Christmas presents to his customers items having a cost of $200 and $175 in the years 1949 and 1950, respectively. The tax returns as prepared for George and accounting records maintained by him disclose the total amounts of bets placed *290 by bettors with George, the amounts paid to customers, and the net receipts, as follows: Net (After
Total Paid
Bets and
Total Bets
Customers
Expenses)
1947
$1,135,251.00
$1,057,740.05
$20,688.84
1949
979,208.25
925,718.12
17,149.94
1950
1,199,500.00
1,105,293.02
31,520.66 The above amounts include the sum of $2,120 as having been won from operating a "21" game for a few weeks in 1947 and $1,816 as the net amount won from operating "smokers" in 1950. The tax returns filed for said years also disclose the receipts and disbursements as reported by George from the operation of the Athens Hotel. After George filed his amended return for 1947, an internal revenue agent audited the income tax returns filed by petitioner for that year. The agent accepted the amount George reported as income and expenses from his gambling operation and made no attempt to verify the accuracy of such figures. After the agent's examination, respondent issued a certificate of overassessment for the year 1947 in the amount of $1,073.91. On April 10, 1952, respondent's agent Walton was assigned to the investigation of George's income tax returns for the years *291 in issue. He spent 2,048 hours on the investigation from April 10, 1952 to October 15, 1954. Special agent Seay was assigned to the investigation from May 8, 1953 to June 6, 1956. Respondent's agents computed George's net worth during the years in issue by reference to his tax returns, financial statements submitted to banks by George, bank records, records maintained by George and affidavits and invoices from merchants and others dealing with him. The following net worth computation takes into account the adjustments to respondent's computation made necessary by our findings and correctly reflects George's net income and net income reported by him during the years in issue. ASSETS
1/1/47
12/31/47
12/31/48
12/31/49
12/31/50
CASH ON HAND
$15,000.00
$15,000.00
$15,000.00
$ 15,000.00
$ 15,000.00
STOCK - Palm Spring Heights, Inc.
7,500.00
7,500.00
7,500.00
7,500.00
INVESTMENT - Pan American Chemi-
cals Co.
2,500.00 [1]
OTHER ASSETS (Determined by
resp. and not contested by petr.)
35,845.72
46,320.09
59,982.46
85,576.31
100,157.58
TOTAL ASSETS
$50,845.72
$68,820.09
$82,482.46
$108,076.31
$125,157.58
LIABILITIES
RESERVE FOR DEPRECIATION
$ 1,244.06
$ 1,957.19
$ 3,345.60
$ 4,894.62
$ 6,482.91
CONTRACTS AND NOTES PAYABLE
17,500.00 [2]
7,500.00 [3]
7,500.00 [2]
TOTAL LIABILITIES
$ 1,244.06
$ 1,957.19
$20,845.60
$ 12,394.62
$ 13,982.91
NET WORTH
$49,601.66
$66,862.90
$61,636.86
$ 95,681.69
$111,174.67
NET WORTH AT START OF YEAR
49,601.66
66,862.90
61,636.86
95,681.69
INCREASE IN NET WORTH
$17,261.24
($ 5,226.04)
$ 34,044.83
$ 15,492.98
LESS: Capital Loss Carryover al-
lowed in respondent's determination
2,000.00
1,000.00
1,000.00
$15,261.24
$ 33,044.83
$ 14,492.98
ADD: Non-deductible Expenditures
(as adjusted)
8,582.15
7,920.73 [4]
23,447.42 [5]
NET INCOME CORRECTED
$23,843.39
$ 40,965.56
$ 37,940.40
NET INCOME PER RETURN
$15,021.92 [6]
$ 10,573.02
$ 35,305.62
ADJUSTMENT (1947 - 1/2 to each
spouse)
$ 8,821.47 [7]
$ 30,392.54
$ 2,634.78
*292 George had unreported income in the following amounts during the years in issue: Year
Unreported Income
1947
$ 4,410.73
1949
30,392.54
1950
2,634.78 The returns for the years 1947 and 1949 were not false or fraudulent with intent to evade tax and no part of the deficiency for each *293 of the years in issue was due to fraud with intent to evade tax. Opinion This case involves deficiencies in tax and additions to tax for fraud for each of the years 1947, 1949 and 1950. Petitioners' position is that respondent's use of the net worth method of computing income is improper and, alternatively, that respondent's net worth statement does not correctly reflect petitioners' net worth and taxable income. Petitioners' first argument, that the books and records kept for George's business were adequate for purposes of determining his taxable income, cannot be sustained. It is well settled that even where books and records appear on their face to be adequate, respondent is not precluded from resorting to the net worth method of computing income. Holland v. United States, 348 U.S. 121, rehearing denied 348 U.S. 932; Davis v. Commissioner, 239 F. 2d 187 affirming T.C. Memo. 1955-87 [14 TCM 294], certiorari denied 353 U.S. 984, rehearing denied 354 U.S. 915; Baumgardner v. Commissioner, 251 F. 2d 311, afirming T.C. Memo. 1956-112 [15 TCM 559]. As suggested in Holland v. United States, supra, *294 books and records may be "more consistent than truthful," and where, as here, there is a showing of a substantial increase in net worth in excess of reported income, without reasonable explanation of such discrepancy, the net worth method reflects on the overall accuracy of income reported on the books and on the returns. The net worth method is not itself a system of accounting but merely a technique for reconstructing a taxpayer's correct net income. Michael Potson, 22 T.C. 912, affd. sub nom. Bodoglau v. Commissioner, 230 F. 2d 336; Estate of George L. Cury, 23 T.C. 305; Morris Lipsitz, 21 T.C. 917, affd. 220 F. 2d 871, certiorari denied 350 U.S. 845; Harry Gleis, 24 T.C. 941, affd. 245 F. 2d 237. Petitioners' alternative argument goes to the application of the net worth method to the facts of this case. It is claimed that the net worth statement is without any evidentiary value because of errors revealed by the record. Though not clear, it is apparently petitioners' initial position that the net worth statement was prepared without adequate investigation of the items included *295 therein and should be disregarded as arbitrary. The contention has no basis in fact. The net worth statement upon which respondent's determination was based was prepared by agents of respondent who testified at the hearing with respect thereto. At the hearing counsel for respondent orally advised the Court that the net worth statement attached to his answer contained certain errors. On brief, respondent has submitted a net worth statement which has been revised to correct such conceded errors and which results in a reduction of the amount of the deficiency for each of the years in issue. Many of the items set out in the revised net worth statement are undisputed. We have resolved the disputed items in our findings and will discuss those deemed to be most important. Cash on Hand, Bankroll Respondent's revised net worth statement credits George with cash on hand in the amount of $4,000 for each of the critical dates. The evidence shows that the local racing season commenced some time between Christmas and New Year's for each of the years involved and that increased wagering activity during this period required a large bankroll. Accordingly, after considering the evidence we have *296 found that on each of the net worth dates George had cash on hand in the amount of $15,000. In making this finding we have noted that the petitioners' witness Ligier testified that $15,000 was the average of the bankroll during each of such racing periods. In these circumstances the actual size of the bankroll is of no significance in determining taxable income by the increase in the net worth method. This case is to be distinguished from Estate of Phillips v. Commissioner, 246 F. 2d 209, cited by petitioners. In that case there was no evidence that cash on hand was a constant. It is also contended by petitioners that the amount of cash on hand on December 31, 1948 should be increased by an additional $10,000. They argue that such amount was derived from a loan in that amount which George received from the Bank of America on December 10, 1948, which was deposited in the account of the North Shore Club on May 19, 1949. There is no evidence showing that this $10,000 was segregated by George and kept for the specific purpose of investing in the North Shore Club. George was not a witness in this case and we are without any testimony by anyone having actual knowledge respecting *297 the handling of the money. In the absence of any direct evidence that George held the $10,000 separate from his gambling bankroll the logical inference is that such money was used as a part of the $15,000 bankroll necessary for operating a horse book during the busy midwinter season. Petitioners have failed to show respondent's net worth statement erroneous with respect to this item and accordingly no adjustment has been made. Stock in Palm Spring Heights, Inc. According to respondent's net worth statement George acquired stock in Palm Spring Heights, Inc. during 1947 at a cost of $7,500 and he continued to own such stock during the remainder of the period in issue. The evidence shows that in 1948 George obtained a loan from Walter Melrose in the amount of $7,500 and endorsed and delivered such stock to Melrose as a security for such loan. There is no evidence showing that this $7,500 was kept separate by George for any specific purpose. As stated above George was not a witness in this case and there is no testimony regarding the disposition of the money. The logical inference is that such money was used as a part of the $15,000 bankroll maintained by George. We have adjusted *298 the net worth statement to reflect such transaction. Stock in Pan American Chemicals Co. Respondent determined that on December 31, 1950 George owned stock in a corporation known as Pan American Chemicals Co. having a cost of $7,500. From the evidence we have found that George invested only $2,500 in such company. Nondeductible Expenditures George expended the amounts of $1,050 and $1,000 in the respective years 1949 and 1950 in payment of rent for his lodging while working in the North Shore Club during the summer months. On the net worth statement respondent treated such amounts as nondeductible expenditures. Petitioners claim that the amounts are deductible and that respondent's treatment was erroneous. We agree with petitioners. Section 23(a)(1)(A), Internal Revenue Code of 1939, provides for the deductibility of traveling expenses including the entire cost of meals and lodging incurred while away from home in pursuit of a trade or business. Where a taxpayer accepts temporary employment away from home or from his principal post of duty, the traveling expenses incurred in connection with such employment are deductible. Harry F. Schurer, 3 T.C. 544; E. G. Leach, 12 T.C. 20; *299 Coburn v. Commissioner, 138 F. 2d 763. In the instant case the evidence is undisputed that George's home and principal place of business during the years 1949 and 1950 were at Cathedral City and Palm Springs. He incurred the above-mentioned rental expense while working temporarily at the North Shore Club during the summer months. Alois Joseph Weidekamp, 29 T.C. 16. Such expenses are "traveling expenses" within the purview of section 23(a)(1)(A), and are deductible as such. Respondent's treatment on his net worth statement is erroneous and we have adjusted it accordingly. During the years 1949 and 1950 George spent the respective amounts of $396.50 and $351.99 to purchase liquor which was given both to customers and to local law enforcement officers at Christmas time. Respondent treated such entire amounts as nondeductible expenditures. We do not understand petitioners to contend gifts of liquor to law enforcement officers are a deductible expense. However, they do argue that the amounts expended for gifts to George's customers are deductible. We do not think respondent seriously contends otherwise. From the evidence presented it is clear that such amounts *300 were actually expended and it appears that such gifts come within the realm of ordinary and necessary business expenses. We have found that of such amounts expended, items having a cost of $200 and $175 were given as Christmas presents to George's customers for the years 1949 and 1950, respectively. Cohan v. Commissioner, 39 F. 2d 540. Petitioner's contention that respondent erroneously treated certain other expenditures as nondeductible is not supported by the evidence. We hold that respondent's use of the net worth method in determining the net income of petitioners for each of the years in question was proper. We further hold that petitioners have failed to overcome the presumptive correctness of respondent's determination as adjusted by our findings for each of the years in question. Accordingly, the deficiencies determined by respondent as adjusted are sustained. Fraud Respondent has determined additions to tax for fraud under section 293(b) of the Internal Revenue Code of 1939 for each of the years in question. The parties agree that assessment of deficiencies for the years 1947 and 1949 is barred unless the returns for those years were false or fraudulent *301 with intent to evade tax within the meaning of section 276(a) of the Internal Revenue Code of 1939. The respondent bears the burden of proving the requisite fraud and the evidence must be clear and convincing. The fact that respondent has determined a greater tax liability than reported and such determination is sustained does not of itself establish fraud. An intent or purpose to evade tax is essential. Estate of Louis L. Briden, 11 T.C. 1095, 1132, affd. sub nom. Kirk v. Commissioner, 179 F. 2d 619; Harold B. Franklin, 34 B.T.A. 927, 935; James Nicholson, 32 B.T.A. 977, affd. 90 F. 2d 978. In the more recent case of Drieborg v. Commissioner, 225 F. 2d 216, affirming in part and reversing in part a Memorandum Opinion of this Court [13 TCM 170], it was said: "At the outset it should be emphasized that the failure of the taxpayers to overcome the presumptive correctness of the deficiencies, even though those deficiencies cover a consecutive ten year period, cannot be regarded, in and of itself, as sufficient proof that the deficiencies or any part thereof were due to fraud on the part of *302 the taxpayers. To hold otherwise would be to ignore the statute which imposes on the Commissioner the burden of proving fraud, and the often repeated admonition that such proof must be by clear and convincing evidence. Wiseley v. Commissioner, 6 Cir., 1950, 185 F. 2d 263; Rogers v. Commissioner, 6 Cir., 1940, 111 F. 2d 987, 989; Mitchell v. Commissioner, 5 Cir., 1941, 118 F. 2d 308. There must be additional independent evidence from which fraudulent intent on the part of the taxpayer can be properly inferred. * * * "That the difference in the burden of proving ordinary tax deficiencies and civil fraud can have important practical results has long been recognized. 'As to the issue raised by [the Commissioner's] determination of fraud the burden is upon him; and he may fail to sustain such burden, notwithstanding the determined and presumed error in the return. In other words, both parties may fail through inadequate proof on their several issues, and thus the deficiency would be sustained and the penalty set aside.' L. Schepp Co., 1932, 25 B.T.A. 419, 437. * * * It is recognized that the consistent and substantial understatement *303 of income over a period of years may constitute clear and convincing evidence of fraud. Holland v. United States, supra. However, where the understatement of income is established only by reason of petitioners' failure to sustain their burden of overcoming the presumptive correctness of respondent's determination based upon the net worth method there must be some additional independent evidence from which fraudulent intent can be properly inferred. Drieborg v. Commissioner, supra.We do not find such evidence in the record and accordingly, we hold that the respondent has failed to establish by clear and convincing evidence that any part of the deficiency for any of the years involved was due to fraud with intent to evade tax. Accordingly, petitioners are not liable for any additions to tax under the provisions of section 293(b) of the Internal Revenue Code of 1939 for any of the years in issue. It necessarily follows from what we have said that respondent has not established that the returns filed by petitioners for the years 1947 and 1949 were false or fraudulent with intent to evade tax within the meaning of section 276(a) of the Internal Revenue Code *304 of 1939 and the assessment and collection of the deficiencies for the years 1947 and 1949 are barred by limitations. Decisions will be entered under Rule 50. Footnotes
1. This figure represents the investment in Pan American Chemicals Company as determined herein. ↩
2. This figure consists of the $10,000 borrowed from Bank of America on December 10, 1948 and the $7,500 borrowed from Walter Melrose in 1948 and secured by Palm Spring Heights, Inc. stock. ↩
3. This figure represents the debt owed to Walter Melrose which is secured by the Palm Spring Heights, Inc. stock. ↩
4. This figure consists of the Nondeductible Expenditures determined by respondent reduced by $1,250, the amount found to be deductible. ↩
5. This figure consists of the Nondeductible Expenditures determined by respondent reduced by $1,175, the amount found to be deductible. ↩
6. George reported one-half of this amount on his individual return and his spouse reported one-half on her return for that year. ↩
7. One-half of this amount, or $4,410.73, is attributable to George.↩